UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD D. LEE, | ) | Case No. 07 cv 5829 |
| | ) | |
| Plaintiff, | ) | Judge John W. Darrah |
| v. | ) | |
| | ) | |
| BURLINGTON NORTHERN SANTA | ) | |
| FE RAILROAD COMPANY, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| v. | ) | |
| | ) | |
| QUALITY TERMINAL SERVICES, et al., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case was commenced by Plaintiff Ronald D. Lee in Illinois state court on September 7, 2007. Plaintiff sued Defendant BNSF Railway Company ("BNSF," named in the complaint as Burlington Northern Sante Fe Railroad Company) and related BNSF entities for injuries he sustained on September 5, 2005, at an intermodal freight facility in Cicero, Illinois, operated by BNSF. Plaintiff's complaint named various entities as "Respondents in Discovery" in the case. The case was removed to federal court on October 15, 2007. On April 24, 2008, BNSF filed a third-party complaint for indemnification and contribution against Quality Terminal Services ("QTS"), not previously named as a defendant or a respondent in discovery. On May 7, 2008, Plaintiff filed an amended complaint, naming QTS as a respondent in discovery.

On June 26, 2008, a motion by QTS to dismiss Plaintiff's respondent in discovery action against QTS was granted. Now before the Court is the motion of QTS for summary

1

judgment on BNSF's third-party complaint against QTS for indemnification and contribution (Docket No. 78). For the reasons stated below, the motion is denied.

## LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006). The moving party has the initial burden to show that the evidence is insufficient to establish a material element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party meets this burden, the non-moving party cannot rest on conclusory pleadings but must "set forth specific facts in affidavits or otherwise to show that there is a genuine issue of material fact that must be decided at trial." *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987). That is, the non-moving party must "present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). If the evidence supporting the non-moving party's claim is insufficient for a reasonable jury to return a verdict in its favor, the court will grant summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## BACKGROUND

The following background facts are derived from the parties' filings required under Local Rule 56.1.[1] Any disputes between the parties as to material facts will be addressed in the pertinent analysis section below.

In September 2005, Plaintiff was the owner/operator of a semi-tractor and worked for a company called Roadlink, USA ("Roadlink"). (BNSF Resp. to QTS' SMF, ¶ 1.) BNSF operates an intermodal freight facility in Cicero, Illinois ("the Cicero Yard"). (BNSF Resp. to QTS' SMF, ¶ 2). QTS is a terminal services company that contracted with BNSF to perform certain intermodal operations at the Cicero Yard pursuant to an Intermodal Facility Services Agreement (the "Agreement"). (BNSF Resp. to QTS' SMF, ¶ 3). Among the services QTS provided under the Agreement was the performance of hostling services. QTS employed hostler drivers who transported trailers and containers and/or chassis from trackside to where they would be picked up by outside drivers. Employees who remove containers from the train and load a trailer are crane operators; the crane operators are employed by the railroad. (Ellman Dep. 10, 11.) QTS also contracted to conduct job safety briefings, determine employee work assignments and transport crews to and from their work assignments. (Dep. of Alan Copeland, QTS Ex. F, at 133, 146-47; Ellman Aff., QTS Ex. B, ¶¶ 5,6.)

---

[1] Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the party contends there is no genuine issue for trial." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Local Rule 56.1(b)(3) requires the non-moving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to respond to a Rule 56.1 statement results in the court's admitting the uncontroverted statement as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

In pertinent part, Sections 5(a)(iv) and (v) of the Agreement provide:

5. LIABILITY AND COMPLIANCE WITH LAWS

(a) <u>Indemnity</u>

Contractor[2] covenants and agrees to protect, indemnify, defend and hold harmless Railroad Company, its parent, subsidiaries and affiliated companies along with their agents, employees and officers ("indemnified parties") from and against any and all claims, liability, loss, damage, demands, actions and causes of action, made against the indemnified parties or for any cost or expense, including attorneys' fees, incurred by the indemnified parties as a result of claims made by any person (including without limitation any third party and Contractor's and Railroad Company's licensees, invitees, employees, agents and contractors) which shall arise or result from or in any manner be connected with:

\*\*\*

(iv) Contractor's failure to accomplish proper loading or securement of a trailer/container to the chassis or the railcar, regardless of inspections of such equipment performed by Contractor and indemnified parties, and regardless of whether such ensuing loss, damage or destruction occurs within the terminal-excluding cases of equipment defects. This provision explicitly includes any and all costs of any traffic accident or derailment which such lack of proper loading or securement may cause;

(v) Injury to or death of any person, including employees of either Contractor or Railroad Company, or loss, destruction of, or damage to any property arising directly or indirectly, in whole or in part, from the actions or omissions of Contractor or its employees, unless such injury, death, loss, destruction, or damage is proximately caused by the sole negligence of the indemnified parties. This provision expressly includes, but is not limited to, remediation of any contamination or other environmental damage. It shall be Contractor's responsibility to conduct a visual inspection of all trailers/containers/chassis prior to commencing a move. Contractor shall immediately advise Railroad Company of any loss or damage detected to trailers/containers/chassis or contents during such inspections.

(BNSF Resp. to QTS' SMF, ¶ 30.)

---

[2]In the Agreement, "Contractor" refers to QTS, and "Railroad Company" refers to BNSF.

In addition, Section 5(d) of the Agreement contains the following "Notice and Defense" provision:

(d) <u>Notice and Defense</u>

In the event any claim or suit is brought against the Indemnified Parties for which Contractor is responsible under this Section 5, or in the event any claim or suit is brought against the Indemnified Parties arising out of work performed, materials furnished, or other activities conducted under the terms of this Agreement, for which Contractor is responsible under the provisions of this Agreement, Railroad Company shall give Contractor reasonable notice in writing of the pendency of such claims or suit, and upon receipt of such notice, Contractor shall forthwith assume the defense of such claim or suit, and shall save and hold harmless the Indemnified Parties from all loss, cost, expense and liability by reason thereof. If Contractor fails to assume the defense of a claim or suit for which Contractor is responsible under the provisions of this Agreement, Contractor shall be bound by the resulting judgment or Railroad Company's settlement as to all matters which could have been compromised or litigated in such suit by Contractor.

(BNSF Resp. to QTS' SMF, ¶ 31.)

Plaintiff was injured when he was picking up a container at the Cicero Yard on September 10, 2005. Plaintiff alleges that the cargo/freight he was to pick up was not properly loaded onto the chassis by a crane operator or groundman. Plaintiff alleges that BNSF failed to properly load and secure the container he was to pick up; and when he attempted to ensure that the container was secure, the container dropped suddenly and unexpectedly on his hand, causing him severe permanent injury. (Am. Complt.)

Guy Hampton was the BNSF Hub Manager on duty at the time of the accident and investigated the accident. Hampton prepared an initial Intermodal/Automotive Accident & Injury Report. (QTS Ex. S.) This initial report was placed in a folder pertaining to intermodal accidents contained on an electronic bulletin board that is

5

accessed via Outlook on BNSF's computer system. (QTS Resp. to BNSF's SMF, ¶ 1.) The contents of the bulletin board are stored within BNSF's Exchange email server environment. QTS had access to BNSF's public intermodal folder in 2005 and was aware that BNSF personnel prepared an Intermodal/Automotive Accident & Injury Report dated September 10, 2005. (QTS Resp. to BNSF's SMF, ¶ 5.)

Sometime after the initial report, Hampton prepared a final Intermodal/Automotive Accident & Injury Report, which contains more information about Plaintiff's accident than the Initial Report. (QTS Ex. U.) The parties do not agree on when this final report was prepared and when it was first posted on BNSF's electronic bulletin board.

BNSF's claims representative, Richard Dennis, also responded to the incident. There were no eyewitnesses. Plaintiff was in the hospital and unavailable. Mr. Dennis gathered facts from Mr. Hampton; Kevin Rainey, the BNSF trainmaster who found Plaintiff injured in Lot E at the Cicero Yard; and Plaintiff's supervisor, Bob Leburg, who had spoken to Plaintiff. (QTS Resp. to BNSF's SMF, ¶ 15.) Mr. Dennis placed Mr. Hampton's initial Intermodal/Automotive Accident & Injury Report in the file. In the weeks following the incident, Mr. Dennis concluded that the case was one of truck carrier responsibility under the Uniform Intermodal Interchange Facilities Access Agreement. Dennis closed his file in October 2005 or early November 2005. (QTS Resp. to BNSF's SMF, ¶ 16.)

On January 31, 2007, a lawyer retained by Plaintiff sent a letter to BNSF regarding the injuries sustained by Plaintiff due to a container that had been "improperly loaded onto [Plaintiff's] vehicle." Mr. Dennis responded to the letter on February 26, 2007, and acknowledged the representation. (QTS Resp. to BNSF's SMF, ¶ 17.) As noted above, Plaintiff ultimately filed this suit on September 7, 2007. While the lawsuit was proceeding, on April 14, 2008, BNSF sent a letter to QTS, notifying it under the indemnification provision of the Agreement. The letter stated that QTS's Director of Operations, Robert Ellman, testified during a deposition[3] that if the chassis and container were moved to Lot E where Plaintiff was found injured, that work would have been done by a QTS hostler. The letter further stated: "BNSF hereby provides notice under Section 5(d) of the Agreement, and requests that QTS assume the defense of th[e] suit and indemnify BNSF from and against any settlement, judgment, or expense including attorneys' fees, in connection therewith."

BNSF sent a similar letter to Plaintiff's employer, Roadlink, seeking indemnification somewhere between September and November 2005.

QTS asserts that it first learned of Plaintiff's case in February 2008, when it received a Fed. R. Civ. P. 30(b)(6) subpoena issued by the Plaintiff in the litigation.

---

[3]Ellman's deposition took place on April 9, 2008.

## ANALYSIS

QTS contends it is entitled to summary judgment on BNSF's third-party complaint because there is no dispute that BNSF did not provide written notice to QTS of Plaintiff's claim until BNSF's April 14, 2008 letter to QTS. QTS contends this notice is insufficient to comply with the requirements of Section 5(d) of the Agreement, requiring that BNSF give QTS "reasonable notice in writing of the pendency" of any claim or suit brought against BNSF for which QTS is responsible.

QTS argues that BNSF should have provided QTS with written notice "at the time of [P]laintiff's injury just as it did with respect to providing notice to Roadlink." QTS asserts that Section 5(d)'s notice requirement commenced as soon as BNSF had reason to believe that plaintiff's injury was related to a container that was not properly loaded, and BNSF knew this was Plaintiff's allegation within thirty days of Plaintiff's injury on September 10, 2005; yet, BNSF did not notify QTS at that time. Furthermore, QTS asserts BNSF had other, subsequent "reminders" that Plaintiff had a claim but still failed to notify QTS. QTS asserts that BNSF "could have provided QTS with written notice after learning that plaintiff had retained counsel in February of 2007"; and "BNSF also could have provided QTS with written notice that plaintiff had filed suit on September 7, 2007." However, BNSF did not notify QTS at those times, either.

QTS argues that BNSF's delay in providing written notice, until April 14, 2008, prejudiced QTS. QTS asserts it was deprived of the ability to conduct a meaningful investigation of Plaintiff's claim and to attempt to resolve Plaintiff's claim prior to the commencement of suit.

In support of its motion for summary judgment, QTS relies primarily on *Tucker v. Reading Co.*, 335 F.Supp. 1269 (E.D. Pa. 1971) (*Tucker*), and the Wisconsin state case *Kreckel v. Walbridge Aldinger Co.*, 721 N.W.2d 508 (Wis. App. 2006) (*Kreckel*). In *Tucker*, the court found that a seventeen-month delay by a railroad in giving notice to an equipment manufacturer, whose lease agreement with the railroad provided for indemnification and required the railroad to give the manufacturer "reasonable notice" of any suit, was too long a delay and relieved the manufacturer of its obligation to indemnify the railroad. In *Kreckel*, the court held that even in the absence of a specific contractual provision, an indemnitee has a duty of good faith and fair dealing to provide an indemnitor reasonable notice of a claim for which indemnification is sought. The court found that the indemnitee forfeited the right to indemnification where a negligence lawsuit against it was filed in February 2002, but the indemnitee did not notify the insurance company from which it sought indemnification until April 2004. The court held the "unnecessary delay of approximately twenty-six months is well beyond what the law will abide." *Kreckel*, 721 N.E.2d at 513.

QTS contends BNSF's delay of fourteen months from the time BNSF discovered Plaintiff had retained counsel is unreasonable, constitutes a breach of BNSF's notification obligation under the Agreement, and forfeits BNSF's right to seek indemnification. QTS asserts that BNSF could "easily have anticipated" in February 2007 that QTS would be joined as a third-party defendant in a lawsuit by the Plaintiff, but BNSF did not provide written notice to QTS under the Agreement until fourteen months thereafter, in April 2008.

9

BNSF disputes that it breached its contractual obligation to notify QTS. BNSF points out that the Agreement requires BNSF to give QTS reasonable notice in writing in the event that "any claim or suit is brought"; the Agreement does not require BNSF to provide notice "of an occurrence."

Further, BNSF contends it did provide QTS written notice "at the time of the occurrence that plaintiff's injury was due to an improperly loaded container" when it posted Guy Hampton's initial report on the electronic bulletin board on September 10, 2005. BNSF contends this gave QTS actual notice of Plaintiff's accident, and QTS could have investigated for itself to determine which QTS hostler drivers were on duty. BNSF also asserts that Plaintiff's accident was discussed at operations and safety meetings in the days following the accident in September 2005, which were attended by QTS personnel. BNSF asserts: "follow-up job safety briefings mentioned in the final version of Hampton's Intermodal/Automotive Accident & Injury Report, posted November 30, 2005, were conducted by QTS supervisors." BNSF points out that Robert Ellman acknowledges that he received a subpoena in the lawsuit in February 2008. (QTS Ex. B.; Ellman Aff., ¶ 11.) Thus, QTS was on notice of the lawsuit as early as February 2008, and BNSF's formal notice was sent in April 2008. As a result of these assertions, BNSF contends, "QTS knew about the accident and suffered no prejudice."

In its reply, QTS disputes BNSF's assertions that Plaintiff's accident was discussed by QTS personnel at safety meetings and BNSF's assertion that Guy Hampton's "final" intermodal accident report was posted on BNSF's electronic

bulletin board as of November 2005.[4] It also disputes that these forms of notice, if they occurred, would be sufficient to meet the notification requirements of the Agreement. QTS points out that the Agreement requires that all notices thereunder be in writing and mailed to QTS at its corporate offices in Denver, Colorado. The only notice BNSF provided that satisfies this requirement appears to be the April 14, 2008 letter.

Even assuming the April 14, 2008 letter is the only written notice BNSF provided to QTS under the Agreement, it cannot be determined on summary judgment that BNSF's notice is unreasonable as a matter of law. As BNSF points out, the indemnification provision in the Agreement requires BNSF to provide reasonable notice in writing of the pendency of any "claim or suit" brought against BNSF for which QTS is responsible. This language could be read to suggest that notice is required only upon the filing of a "claim or suit," not when BNSF could "anticipate" a claim. Plaintiff was injured in September 2005, and a lawyer contacted BNSF in February 2007; no lawsuit was actually brought by Plaintiff against BNSF until September 2007. Furthermore, BNSF has submitted evidence, indicating that after BNSF investigated the accident in 2005, BNSF concluded that the accident involved truck carrier responsibility. BNSF notified Plaintiff's employer, Roadlink, at that time but did not notify QTS until after Ellman's deposition was taken during discovery in the lawsuit. BNSF contends that it discovered the significance of the involvement of QTS at the deposition. On these facts, whether BNSF's written notice to QTS in April 2008 is reasonable under the circumstances

---

[4]QTS asserts that BNSF identified only Hampton's initial report in discovery depositions as the notice BNSF gave to QTS and, therefore, cannot now contradict its discovery responses by now asserting that BNSF also notified QTS by Hampton's "final" report.

11

presents an issue of material fact. *See Northbrook Property & Cas. Ins. Co. v. Applied Systems, Inc.,* 729 N.E.2d 915, 921 (Ill. App. 2000) (unless all the material facts are not in dispute, whether an insured's notice was given in a reasonable time generally depends on the facts and circumstances of the particular case). Furthermore, whether QTS suffered prejudice as a result of the timing of BNSF's notice also presents a disputed factual issue. Accordingly, summary judgment in favor of QTS on the third-party complaint is not warranted on the ground that BNSF failed to provide QTS with reasonable written notice.

QTS also argues that it is entitled to summary judgment because BNSF has no valid claim for indemnification or contribution under the terms of the Agreement. According to QTS, BNSF's theorizes that there is liability under Section 5(a)(iv) because QTS failed to properly supervise the loading of the container onto Plaintiff's truck; and liability exists under Section 5(a)(v) because QTS's hostler drivers failed to inspect the rear of the container to the chassis prior to its movement.

QTS contends there is no claim for indemnification under Section 5(a)(iv) because there is no dispute that QTS did not perform the physical task of loading and unloading containers at the Cicero Yard, and Section 5(a)(iv) does not impose any supervisory responsibility on QTS with respect to the loading and unloading of containers.[5] QTS contends there is no claim under Section 5(a)(v) because the evidence shows that QTS had no duty under the Agreement to perform an inspection of the

---

[5]As set out in the background section of this opinion above, Section 5(a)(iv) provides for indemnification for contractor's "failure to accomplish proper loading or securement of a trailer or container to the chassis."

12

attachment of the rear of the container to the chassis prior to its movement, as BNSF contends.[6]

BNSF, however, contends it is entitled to both contribution and indemnity from QTS. With respect to contribution, BNSF denies QTS's position that a contribution claim must be supported by the breach of a specific duty of QTS that is stated in the Agreement. Rather, BNSF contends, there is an independent basis for a claim of contribution against QTS, specifically, the common-law negligence of QTS. To show there is basis for a negligence claim against QTS, BNSF relies on deposition testimony given by Robert Ellman. Ellman testified that the container and chassis involved in Plaintiff's accident would have travelled from trackside to Lot E by a QTS hostler driver; and in the typical case, the QTS hostler driver would have also made a drive-by inspection of the container and chassis to make sure it was properly seated. BNSF argues that if the jury believes Plaintiff was injured as the result of an improperly seated container that a QTS driver should have seen and fixed, QTS could be liable under the common law of negligence.

QTS does not reply to BNSF's argument as to contribution, arguing in its reply only that BNSF has no viable indemnification claim. BNSF has pointed to sufficient evidence to show a viable third-party claim for contribution; summary judgment on

---

[6]As more fully set out above, Section 5(a)(v) provides, in pertinent part, for indemnification where injury occurs due to the "actions or omissions of Contractor or its employees unless such injury . . . is proximately caused by the sole negligence of the indemnified parties. The provision also states: "It shall be Contractor's responsibility to conduct a visual inspection of all trailers/containers/chassis prior to commencing a move. Contractor shall immediately advise Railroad Company of any loss or damage detected to trailers/containers/chassis or contents during such inspections."

13

BNSF's third-party contribution claim, accordingly, is denied.

BNSF contends the plain language contained in Section 5(a)(v) of the Agreement, stating that "[i]t shall be Contractor's responsibility to conduct a visual inspection of all trailers/containers/chassis prior to commencing a move," provides a sufficient basis to support a third-party claim for indemnification. BNSF contends "[t]he plain meaning of [this] provision is that QTS is responsible to conduct a visual inspection before making a move, and that if injuries result from its failure to do so, QTS owes BNSF indemnity." BNSF relies on the plain language quoted above, the deposition testimony of Robert Ellman (discussed above in connection with the contribution claims), as well as testimony of Alan Copeland, BNSF's Senior Manager of Hub Operations at the Cicero Yard. Copeland testified that it is the responsibility of QTS's hostler drivers to conduct a visual inspection of the fit of the container to the chassis before the hostler driver moves it trackside. BNSF asserts that all of this evidence demonstrates QTS is subject to indemnify BSNF under Section 5(a)(v) because "Plaintiff alleges that he was injured by a container that was not seated properly and which should have been seen in a visual inspection."

QTS disputes BNSF's interpretation of Section 5(a)(v), arguing that, when read in context of the entire provision, the obligation of the contractor to conduct "a visual inspection of all trailers/containers/chassis prior to commencing a move" refers only to "a loss or damage inspection," not to a visual inspection of the trailers/containers/chassis to ensure that a container is properly loaded. QTS argues that in order to accept BNSF's interpretation, "[t]he Court would have to read language regarding securement or loading

into the term 'visual inspection.'" QTS contends "BNSF's mandatory container securement guidelines in effect at the time of plaintiff's injury preclude the very inspection that BNSF suggests . . . QTS should have performed." In addition, QTS asserts that Guy Hampton and others admitted that QTS's hostler drivers were not required to perform inspections to ensure a container is properly loaded. However, Hampton testified that a QTS hostler is supposed to conduct a visual inspection to make sure a unit is loaded properly. (*See* Hampton Dep., 105.) This appears to be consistent with the testimony of Mr. Ellman. (*See* BNSF Brief at 12-13.) At a minimum, the issue of whether QTS is obligated to conduct the inspection BNSF asserts is a question of fact.

Furthermore, the language of Section 5(a)(v) on its face provides broadly for indemnification by QTS where injury or death arises, in whole or in part, "from the actions or omissions of [QTS] or its employees" unless the injury "is proximately caused by the sole negligence of [BNSF]." This could arguably be construed to provide that QTS has a duty to indemnify BNSF where an injury is caused by *any* negligent act or omission on the part of QTS – not just the acts specifically stated in the Agreement – unless the injury was solely caused by the negligence of BNSF. Therefore, if BNSF could prove at trial that QTS was negligent in some way and this negligence was a proximate cause of Plaintiff's injury, QTS would have a duty to indemnify BNSF under the plain language of Section 5(a)(v). At this juncture, there are issues of material fact on this point.

15

Finally, QTS contends summary judgment should be granted in its favor on the basis of the equitable doctrine of laches. "Laches, or the doctrine of stale demand . . . is a defense peculiar to equity which is bottomed on the reluctance to aid one who has knowingly slept upon his rights." *Pyle v. Ferrell,* 12 Ill.2d 547, 554 (1958) (*Pyle*). Determining whether to provide such a remedy involves consideration of a number of factors, including: (1) conduct on the the part of the defendant for which the complainant seeks a remedy; (2) delay in asserting the complainant's rights, the complainant's having had notice or knowledge of defendant's conduct and the opportunity to institute a suit; (3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the complainant or the suit is held not to be barred. *Pyle,* 12 Ill.2d at 554.

QTS argues BNSF's contribution and indemnification claims are barred by laches for the same reasons it argued BNSF's notice was unreasonable. However, summary judgment is not warranted on the ground of laches; there are material issues as to whether the timing of BNSF's notice to QTS was reasonable under the circumstances and whether, and to what extent, QTS was prejudiced.

16

## CONCLUSION

For all of the reasons stated above, QTS's motion for summary judgment on BNSF's third-party complaint for indemnification and contribution is denied.

Date: May 21, 2009

JOHN W. DARRAH
United States District Court Judge